**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:  (818) 532-6499
E-mail: jpafiti@pomlaw.com
*- additional counsel on signature page -*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY NADASKAY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>PUMA BIOTECHNOLOGY, INC., ALAN H. AUERBACH, and CHARLES R. EYLER,<br><br>Defendants | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff Anthony Nadaskay ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants'

1

public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Puma Biotechnology, Inc. ("Puma" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired common shares of Puma between February 29, 2016 and May 4, 2017, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.    Puma Biotechnology, Inc. is a development-stage pharmaceutical company that is primarily focused on acquiring and developing drug products. At all relevant times, Puma's primary focus has been the development of the drug PB272 ("neratinib"). Neratinib was initially developed by the pharmaceutical companies Wyeth and Pfizer Inc. ("Pfizer"), and Puma acquired the rights to license the drug in 2011.

3.    Founded in January 2010, the Company is headquartered in Los Angeles, California.  The Company's common stock trades on the NASDAQ under the ticker symbol "PBYI."

4.    Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company did not anticipate that the U.S. Food and Drug Administration's ("FDA") would ultimately approve neratinib for the treatment of breast cancer; (ii) as such, Puma had overstated the drug's approval prospects and/or commercial viability; and (iii) as a result, Puma's public statements were materially false and misleading at all relevant times.

5.    On May 4, 2017, post-market, Puma disclosed the resignation of Dr. Robert Charnas, the Company's Senior Vice President, Regulatory Affairs, citing "health reasons."  Dr. Charnas' resignation will be effective as of May 15, 2017, nine days before the FDA scheduled review of Puma's breast cancer drug neratinib on May 24.

6.    On May 5, 2017, *Fox Business* published an online article entitled "Why Puma Biotechnology Shares are Crashing 18.2% Today," stating in relevant part:

> **Puma Biotechnology** (NASDAQ: PBYI) stock has plummeted 18.2% as of 12:53 p.m. EDT following news that Dr. Robert Charnas, its head of regulatory affairs and project management, is hitting the exits ahead of a scheduled Food and Drug Administration (FDA) advisory panel meeting on May 24.

3

> Puma Biotechnology has only one product in its clinical-stage drug pipeline, and that drug, neratinib, has been the subject of a lot of scrutiny after trials showed that a large number of patients taking it suffered from high-grade diarrhea.
>
> Puma Biotech's CEO Alan Auerbach hired Charnas last year to help get neratinib across the regulatory finish line.
>
> ***
>
> News of his departure so close to the FDA advisory committee meeting is disconcerting, regardless of Charnas' reasons for leaving.
>
> After all, neratinib is far from a lock to win the committee's recommendation for approval. It's being considered as an extended maintenance therapy to help delay disease recurrence in breast cancer patients who have previously been treated for one year with Herceptin. In trials, neratinib hit its mark in terms of efficacy, but many of its patients reported severe diarrhea.
>
> In hopes of overcoming a rejection because of this safety risk, Puma Biotech has been studying the use of the anti-diarrhea drug loperamide and steroids alongside neratinib. Ideally, a diarrhea incidence rate below 20% would be desirable, but interim trial results showed a 27% rate of grade 3 or higher diarrhea when using loperamide. Steroids may lower that rate further, but their use can cause other unwanted side effects.

7.     On this news, Puma's share price fell $5.85, or 16.01%, to close at $30.70 on May 5, 2017.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

4

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

11.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).  Puma's principal executive offices are located within this Judicial District.

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13.     Plaintiff, as set forth in the accompanying Certification, purchased common shares of Puma at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

14.     Defendant Puma is incorporated in Delaware, and the Company's principal executive offices are located at 10880 Wilshire Boulevard, Suite 2150, Los Angeles,

California 90024.   Puma's common stock trades on the NASDAQ under the ticker symbol "PBYI."

15.    Defendant Alan H. Auerbach ("Auerbach") founded and has served at all relevant times as the Company's Chief Executive Officer ("CEO"), President, Chairman and Secretary.

16.    Defendant Charles R. Eyler ("Eyler") has served at all relevant times as the Company's Principal Financial and Accounting Officer.

17.    The Defendants referenced above in ¶¶ 15-16 are sometimes referred to-herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

18.    Puma is a development-stage pharmaceutical company that is primarily focused on acquiring and developing drug products. Puma's primary focus has been the development of the drug neratinib. Neratinib was initially developed by Wyeth and Pfizer, and Puma acquired the rights to license the drug in 2011.

### Materially False and Misleading Statements Issued During the Class Period

19.    The Class Period begins on February 29, 2016, when Puma filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2015 (the "2015 10-K").  For the quarter, Puma reported a net loss of $61.70 million, or $1.90 per diluted share, on

revenue of $0, compared to a net loss of $47.50 million, or $1.57 per diluted share, on revenue of $0 for the same period in the prior year. For fiscal year 2015, Puma reported a net loss of $239.28 million, or $7.45 per diluted share, on revenue of $0, compared to a net loss of $141.97 million, or $4.73 per diluted share, on revenue of $0 for fiscal year 2014.

20.    In the 2015 10-K, the Company stated, in relevant part:

> We are a biopharmaceutical company with a focus on the development and commercialization of innovative products to enhance cancer care. We in-license the global development and commercialization rights to three drug candidates—PB272 (neratinib (oral)), PB272 (neratinib (intravenous)) and PB357. Neratinib is a potent irreversible tyrosine kinase inhibitor, or TKI, that blocks signal transduction through the epidermal growth factor receptors, HER1, HER2 and HER4. Currently, we are primarily focused on the development of the oral version of neratinib, and our most advanced drug candidates are directed at the treatment of HER2-positive breast cancer. We believe neratinib has clinical application in the treatment of several other cancers as well, including non-small cell lung cancer, or NSCLC, and other tumor types that over-express or have a mutation in HER2.
>
> ***
>
> We recently completed a Phase III clinical trial of neratinib for the extended adjuvant treatment of women with early stage HER2-positive breast cancer, which we refer to as the ExteNET trial. Based on the results from the ExteNET trial, we expect to file for regulatory approval of neratinib in the extended adjuvant setting in the United States in the first quarter of 2016 and in the European Union in the first half of 2016.
>
> ***

7

Neratinib is a potent irreversible tyrosine kinase inhibitor, or TKI, that blocks signal transduction through the epidermal growth factor receptors, HER1, HER2 and HER4. Based on pre-clinical studies and clinical trials to date, we believe that neratinib may offer an advantage over existing treatments that are used in the treatment of patients with HER2-positive metastatic breast cancer who have failed prior treatments, including treatment with trastuzumab, pertuzumab, and T-DM1. Currently, the treatment of metastatic breast cancer patients involves treatment with these agents either alone or in combination with chemotherapy. We believe that by more potently inhibiting HER2 at a different site and acting via a mechanism different from other agents, neratinib may have therapeutic benefits in patients who have failed these existing treatments, most notably due to its increased selectivity and irreversible inhibition of the HER2 target enzyme.

In addition, we believe neratinib has clinical application in the treatment of other cancers, including non-small cell lung cancer and other tumor types that over-express or have a mutation in HER2.

Our initial focus is on the development of the oral formulation of neratinib. We are also evaluating for potential development an intravenous formulation of neratinib and PB357, a back-up compound to neratinib.

**PB272 (neratinib (oral))—Early Stage Breast Cancer**

\*\*\*

The safety results of the study showed that the most frequently observed adverse event for the neratinib-treated patients was diarrhea, with approximately 39.9% of the neratinib-treated patients experiencing grade 3 or higher diarrhea (1 (0.1%) patient had grade 4 diarrhea). Patients who received neratinib in this trial did not receive any prophylaxis with antidiarrheal agents to prevent the neratinib-related diarrhea. Puma's recently reported clinical data from several trials have demonstrated that the use of high dose prophylactic loperamide greatly reduces the rate of grade 3 diarrhea with neratinib, with grade 3 diarrhea rates ranging from 0-17% in studies in which high dose loperamide prophylaxis was

8

used. In all of its current ongoing studies Puma is instituting the use of high dose loperamide for the first cycle of treatment in order to continue to reduce the neratinib-related diarrhea.

21.     The 2015 10-K contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

22.     On May 10, 2016, Puma filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 10-Q").  For the quarter, Puma reported a net loss of $70.97 million, or $2.19 per diluted share, on revenue of $0, compared to a net loss of $52.45 million, or $1.66 per diluted share, on revenue of $0 for the same period in the prior year.

23.     The Q1 2016 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q1 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

24.     On July 21, 2016, Puma filed a Current Report on Form 8-K with the SEC, announcing that it had "submitted a New Drug Application (NDA) to the U.S. Food and Drug Administration (FDA) for its lead product candidate PB272 (neratinib) for the extended adjuvant treatment of patients with early stage HER2-overexpressed/amplified

breast cancer who have received prior adjuvant trastuzumab (Herceptin®)-based therapy."

25.    On August 9, 2016, Puma filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q2 2016 10-Q").  For the quarter, Puma reported a net loss of $66.60 million, or $2.05 per diluted share, on revenue of $0, compared to a net loss of $64.69 million, or $2.01 per diluted share, on revenue of $0 for the same period in the prior year.

26.    In Exhibit 10.2 to the Q2 2016 10-Q, the Company revealed it had hired Robert Charnas as Senior Vice President of Regulatory Affairs and Project Management, effective July 1, 2016.

27.    The Q2 2016 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q2 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

28.    On November 9, 2016, Puma filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2016 (the "Q3 2016 10-Q").  For the quarter, Puma reported a net loss of $65.78 million, or $2.02 per diluted share, on revenue of $0, compared to a net loss of

$60.42 million, or $1.87 per diluted share, on revenue of $0 for the same period in the prior year.

29.    The Q3 2016 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q3 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

30.    On March 31, 2017, Puma filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2016 (the "2016 10-K"). For the quarter, Puma reported a net loss of $72.70 million, or $2.04 per diluted share, on revenue of $0, compared to a net loss of $61.70 million, or $1.90 per diluted share, on revenue of $0 for the same period in the prior year. For fiscal year 2016, Puma reported a net loss of $276.01 million, or $8.29 per diluted share, on revenue of $0, compared to a net loss of $239.28 million, or $7.45 per diluted share, on revenue of $0 for fiscal year 2015.

31.    The 2016 10-K contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the 2016 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

32.    The statements referenced in ¶¶ 19-25 and 27-31 above were materially false and/or misleading because they misrepresented and/or failed to disclose the

following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company did not anticipate that the FDA would ultimately approve neratinib for the treatment of breast cancer; (ii) as such, Puma had overstated the drug's approval prospects and/or commercial viability; and (iii) as a result, Puma's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

33.    On May 4, 2017, post-market, Puma disclosed the resignation of Dr. Robert Charnas, the Company's Senior Vice President, Regulatory Affairs, citing "health reasons."  Dr. Charnas' resignation will be effective as of May 15, 2017, nine days before the FDA's scheduled review of Puma's breast cancer drug neratinib on May 24.

34.    On May 5, 2017, *Fox Business* published an online article entitled "Why Puma Biotechnology Shares are Crashing 18.2% Today," stating in relevant part:

> **Puma Biotechnology** (NASDAQ: PBYI) stock has plummeted 18.2% as of 12:53 p.m. EDT following news that Dr. Robert Charnas, its head of regulatory affairs and project management, is hitting the exits ahead of a scheduled Food and Drug Administration (FDA) advisory panel meeting on May 24.
>
> Puma Biotechnology has only one product in its clinical-stage drug pipeline, and that drug, neratinib, has been the subject of a lot of scrutiny after trials showed that a large number of patients taking it suffered from high-grade diarrhea.

Puma Biotech's CEO Alan Auerbach hired Charnas last year to help get neratinib across the regulatory finish line.

*\*\*\**

News of his departure so close to the FDA advisory committee meeting is disconcerting, regardless of Charnas' reasons for leaving.

After all, neratinib is far from a lock to win the committee's recommendation for approval. It's being considered as an extended maintenance therapy to help delay disease recurrence in breast cancer patients who have previously been treated for one year with Herceptin. In trials, neratinib hit its mark in terms of efficacy, but many of its patients reported severe diarrhea.

In hopes of overcoming a rejection because of this safety risk, Puma Biotech has been studying the use of the anti-diarrhea drug loperamide and steroids alongside neratinib. Ideally, a diarrhea incidence rate below 20% would be desirable, but interim trial results showed a 27% rate of grade 3 or higher diarrhea when using loperamide. Steroids may lower that rate further, but their use can cause other unwanted side effects.

35.     On this news, Puma's share price fell $5.85, or 16.01%, to close at $30.70 on May 5, 2017.

36.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

37.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

13

otherwise acquired Puma common shares traded on the NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

38.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Puma common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Puma or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

39.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

40.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

14

41.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of Puma;

- whether Defendants caused Puma to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Puma securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

42.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

43.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Puma common shares are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common shares; and

- Plaintiff and members of the Class purchased and/or sold Puma common shares between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

44.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

45.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### <u>Against All Defendants</u>

46.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

47.     This Count is asserted against Puma and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

48.     During the Class Period, Puma and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

49.     Puma and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Puma common shares during the Class Period.

50.    Puma and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Puma were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of Puma, their control over, and/or receipt and/or modification of Puma allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Puma, participated in the fraudulent scheme alleged herein.

51.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Puma personnel to members of the investing public, including Plaintiff and the Class.

52.    As a result of the foregoing, the market price of Puma common shares was artificially inflated during the Class Period.  In ignorance of the falsity of Puma's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on

the statements described above and/or the integrity of the market price of Puma common shares during the Class Period in purchasing Puma common shares at prices that were artificially inflated as a result of Puma's and the Individual Defendants' false and misleading statements.

53.     Had Plaintiff and the other members of the Class been aware that the market price of Puma common shares had been artificially and falsely inflated by Puma's and the Individual Defendants' misleading statements and by the material adverse information which Puma's and the Individual Defendants did not disclose, they would not have purchased Puma's common shares at the artificially inflated prices that they did, or at all.

54.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

55.     By reason of the foregoing, Puma and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Puma common shares during the Class Period.

## COUNT II
### Violation of Section 20(a) of The Exchange Act
### <u>Against The Individual Defendants</u>

56.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

57.    During the Class Period, the Individual Defendants participated in the operation and management of Puma, and conducted and participated, directly and indirectly, in the conduct of Puma's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's inadequate internal safeguards in data security protocols.

58.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Puma's financial condition and results of operations, and to correct promptly any public statements issued by Puma which had become materially false or misleading.

59.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Puma disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Puma to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Puma within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the

unlawful conduct alleged which artificially inflated the market price of Puma common shares.

60.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Puma.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post- judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: May 8, 2017

Respectfully submitted,

**POMERANTZ LLP**

By: */s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone: (818) 532-6499
E-mail: jpafiti@pomlaw.com

**POMERANTZ, LLP**
Jeremy A. Lieberman
J. Alexander Hood II
Hui M. Chang
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile:(212) 661-8665
E-mail: jalieberman@pomlaw.com
E-mail: ahood@pomlaw.com
E-mail: hchang@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
E-mail: pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

Puma Biotechnology, Inc. CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAW

| Submission Date | 2017-05-05 11:12:54 |
|---|---|

# CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

1. I make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.
2. I have reviewed a Complaint against Puma Biotechnology, Inc. ("Puma" or the "Company"), and authorize the filing of a motion on my behalf for appointment as lead plaintiff.
3. I did not purchase or acquire Puma securities at the direction of counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.
4. I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Puma securities during the Class Period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.
5. To the best of my current knowledge, the transactions set forth below represent all of my transactions in Puma securities during the Class Period as specified in the Complaint.
6. During the three-year period preceding the date on which this Certification is signed, I have not sought to serve or served as a representative party on behalf of a Class under the federal securities laws.
7. I agree not to accept any payment for serving as a representative party on behalf of the Class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the Class as ordered or approved by the Court.
8. I declare, under penalty of perjury, that the foregoing is true and correct.

| My Products | |
|---|---|
| **Print Name** | Anthony Nadaskay |

**Acquisitions:**

| Date Acquired MM/DD/YYYY | Number of Shares Acquired | Price per Share Acquired |
|---|---|---|
| 09/30/2016 | 50 | $65.27 |
| 03/17/2017 | 200 | $44.13 |

**Sales: (if none, write '0')**

| Date Sold MM/DD/YYYY | Number of Shares Sold | Price per Share Sold |
|---|---|---|
| 0 | 0 | 0 |

**Draw your signature using your mouse.**



Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic Transactions Act as adopted by the various states and territories of the United States.

Please continue to the next page of certification below.

| Full Name | Anthony Nadaskay |
|-----------|------------------|


(redacted)

**PUMA BIOTECHNOLOGY INC. (PBYI)**                                    **Nadaskay, Anthony**

### LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES/UNITS | PRICE PER SHARES/UNITS |
|---|---|---|---|
| 9/30/2016 | Purchase | 50 | $65.2700 |
| 3/17/2017 | Purchase | 200 | $44.1300 |